UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RICHARD CORNELL,

    Plaintiff,

vs.                           Case No. 8:16-cv-1099-T-33TGW

MEGAN J. BRENNAN,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE,

    Defendant.

_____/

**ORDER**

This matter comes before the Court upon consideration of a Motion for Summary Judgment filed on January 4, 2018, by Defendant Megan J. Brennan, who is sued in her official capacity as Postmaster General of the United States Postal Service. (Doc. # 30). Plaintiff Richard Cornell filed his response to the Motion (Doc. # 31) on February 5, 2018. The Court grants the Motion for the reasons that follow.

**I.**    **Background**

Cornell sues Brennan for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. (Doc. # 1). Cornell asserts claims for discrimination based on sex and hostile work environment based on sex.

Cornell first started working for the Postal Service as a letter carrier in 1966. (Cornell Dep. I Doc. # 30-1 at 15:2-17). In the following years, Cornell moved between jobs with the Postal Service in Florida and Minnesota and other non-government jobs. (Id. at 16:10-52:8). Then, in 1992, Cornell began working at the Winter Haven Post Office as a transitional employee carrier and was later given a clerk position in 1994. (Id. at 53:6-56:4). From then on, Cornell continued to be employed by the Postal Service until he retired in 2015. (Id. at 201:22-24). While with the Postal Service, Cornell was heavily involved with the local workers' union until he left the union in 2013. (Id. at 63:11-12). For a few years, he was the union's associate vice-president and chief steward for the Winter Haven Office. (Id. at 61:12-62:11).

Cornell's problems at his job — about uniforms, who had to wear them, and who should pay for them — began in early 2012. During that time, Cornell's title was sales, service, and distribution associate and his principal assignment area was scheme distribution in the back of the Post Office. (Id. at 87:10-16). Still, he usually covered for window clerks during their lunch breaks because he was both scheme qualified and window qualified. (Id. at 111:19-23). According to

Cornell, full-time window clerks have always been given a uniform allowance and had to wear uniforms while working at the window, where they interact with customers. (Id. at 130:11-15). But Cornell insists that employees who did not qualify for the allowance could wear "acceptable clothing [] to be in a casual professional atmosphere" when they worked the window. (Id. at 129:15-130:1). In contrast, Brennan argues that, under Postal Service regulations, employees who do not qualify for a uniform allowance must wear the appropriate uniform for the position if it is provided to them outside of the uniform allowance program. (Id. at 133:13-18, 139:7-11). Cornell disagrees and believes this standard was not in the manual in 2012. (Id. at 133:19-21, 137:16-24, 139:12-15).

Regardless, early in 2012, the Winter Haven Post Office came under the direction of a new district manager who required all employees to wear uniforms while working at the window. (Id. at 143:19-22). According to Cornell, his supervisor, Randy Hockenberry, told Cornell he had a uniform allowance, handed him a Postal Service credit card, and instructed him to purchase uniforms by February 29, 2012. (Id. at 144:1-13, 151:18-152:17). Cornell insisted he was not entitled to a uniform allowance and was worried that if he

used the credit card to purchase uniforms he would be written up for fraudulent use of the credit card and fired. (Id.).

February 29, 2012, came but Cornell still was not wearing a uniform shirt while working the window. (Id. at 151:18-152:3, 153:2-5). Indeed, Cornell had not ordered a uniform yet. (Id. at 151:18-152:1, 153:6-7). A few days later, on March 14, 2012, Hockenberry issued Cornell a NOS-7, which is a notice of suspension for seven days, and a letter. (Id. at 150:5-151:15). The letter explained the basis for the suspension: Cornell's "unsatisfactory performance/failure to follow instructions." (Id. at 150:5-152:3). Then, because he feared his supervisors had been "waiting to get [him] for all this time" because of his union leadership, Cornell asked the facility's postmaster, Douglas Shirer, to put in writing that Cornell would not face discipline if he agreed to use the credit card. (Id. at 148:8-23, 160:22-161:1; Cornell Dep. II Doc. # 30-2 at 57:21-58:3). Cornell said he would have ordered the uniforms then had Shirer given written confirmation, so that the NOS-7 would be rescinded. (Cornell Dep. I Doc. # 30-1 at 148:8-23). But Shirer refused, so Cornell refused to order the uniforms. (Id.).

Cornell filed a grievance over the NOS-7. (Id. at 127:2-6, 159:1-25). Eventually, Cornell's supervisors provided him

three uniform shirts to wear. (Id. at 148:8-21, 161:11-15).
Cornell initially refused to wear them, arguing it was against
Post Office rules for Post Office funds to be spent to buy
his uniform shirts, but he relented. (Id. at 162:6-25).
Cornell also refused to wear the uniform shirts unless
Hockenberry laundered the shirts for him, which Hockenberry
did for a few weeks. (Id. at 163:4-164:17). Time passed and
Shirer decided on a new and more stringent uniform rule. On
May 11, 2012, Shirer announced that all window qualified
clerks had to wear their uniform polo shirts whenever they
were on the clock — not just when they were working the retail
window. (Id. at 168:2-7, 169:20-170:11). That same day,
Shirer warned Cornell that if he did not wear the uniform
shirt they would "go farther" with discipline by giving him
a fourteen-day suspension. (Id. at 167:8-19, 168:9-19).

After May 11, 2012, Cornell fully complied and wore his
uniform shirt because the NOS-7 on his record meant he would
receive a greater suspension if he were disciplined again.
(Id. at 168:16-169:12, 172:14-175:25). Wearing the uniform
while on the workroom floor was unpleasant for Cornell. The
workroom floor, where mail is sorted and moved, is hot and
Cornell's job involved the heavy lifting and throwing of
parcels. (Cornell Dep. II Doc. # 30-2 at 40:25-41:20). As a

result, when Cornell left the workroom floor to cover the retail window, he was sweaty and unkempt in appearance. (Id. at 41:13-18). Some female employees — Ahn Tran, Yvette Hadlock, Tinia Clark, and Tonya Keefer — did not follow the instruction to wear uniform shirts while on the clock, yet they were not disciplined. (Cornell Dep. I Doc. # 30-1 at 169:13-16).

Cornell eventually filed an EEO complaint in June of 2012, regarding the NOS-7 and how the new uniform rule was not being enforced against female employees. (Id. at 165:15-169:16). In that EEO complaint, Cornell asked that his supervisors either "discipline [the female employees] or rescind [his] NOS-7." (Id. at 175:4-9). According to Cornell, the business agent of the Postal Service then offered him a deal. The Postal service would "kill the discipline" (i.e., revoke the NOS-7) if Cornell withdrew his EEO complaint and grievance. (Id. at 183:19-184:13). Cornell did, so the Postal Service revoked the NOS-7 and Cornell never served the suspension. (Id. at 183:19-184:13, 201:11-17). But the Postal Service did not remove the NOS-7 from Cornell's employee record. (Id. at 201:22-202:11).

After he was first disciplined, Cornell documented every time he saw a co-worker violate the uniform rules. (Id. at

185:5-15). He also reported violations to Hockenberry, Hockenberry's direct supervisor Dean Moseley, and Shirer. (Doc. # 31 at 3-4; Shirer Dep. Doc. # 31-1 at 11:12-13:11). Most violations Cornell recorded were committed by one woman, Tran. (Cornell Dep. Doc. I at 232:16-22). However, neither she nor the other women who broke the uniform rule were suspended. (Id. at 176:22-177:3). Although Cornell contends on "information and belief" that no female employee was ever disciplined in any way for uniform violations, Shirer testified that Hockenberry had issued Tran a Letter of Warning for her violations. (Doc. # 31 at 3; Doc. # 31-1 at 1; Shirer Dep. Doc. # 31-1 at 19:11-20:19). And while a general instruction was given to all employees about the uniform rule, there is no evidence that the identified female employees were given a direct order to procure and wear a uniform shirt by a specific date, but disobeyed.

Male employees also broke the uniform rules. On April 26, 2012, Rusty Herndon violated the rule that clerks always had to wear a uniform shirt while working the retail window. (Cornell Dep. I Doc. # 30-1 at 188:8-190:15). After the more stringent uniform rule was issued on May 11, 2012, Herndon failed to wear his uniform shirt on the workroom floor on numerous days in August and September of 2012. (Id. at 207:24-

208:8, 210:8-13, 212:14-213:4). Cornell also recorded a violation in August of 2012 by a window clerk, Richard Fugate. (Id. at 210:14-211:25). Fugate was out of uniform while he was assigned to help on the workroom floor one Saturday, so Hockenberry told Fugate to put on his uniform shirt. (Id.). Fugate claimed he was unaware of the policy but complied and put on his uniform. (Id.).

Although Cornell recorded no such incidents in his notebook, Cornell testified that Hockenberry and Moseley would flirt and show "frequent favoritism and inordinate attention" toward attractive female employees. (Id. at 234:2-16; Doc. # 31 at 17). According to Cornell, the flirting was common knowledge. (Cornell Dep. I Doc. # 30-1 at 239:10-15). As an example of greater attention being paid to female employees, Cornell recounted a time when Moseley had "put the 'moves' on one of the attractive female[]" employees in his office. (Id. at 234:17-235:20; Doc. # 31 at 14, 17). The female employee was "clearly upset" when she left Moseley's office and told Cornell's wife Joyce, who was also an employee at the Post Office, about the unwelcome sexual advances. (Doc. # 31 at 14). Cornell's wife encouraged the female employee not to tolerate such treatment. (Id.). Having overheard Cornell's wife, Moseley called her into his office and told

her "to mind her own business." (Id. at 14, 17; Cornell Dep. I Doc. # 30-1 at 234:17-235:15). Cornell "consider[ed] that [incident and the flirting] to be part of the hostile work environment based on sex." (Cornell Dep. I Doc. # 30-1 at 235:16-24).

The continued refusal to punish female employees who failed to wear uniform shirts and supervisors' flirtatious treatment towards female employees led Cornell to file two more EEO complaints in December of 2012 and April of 2013. (Doc. # 31-1 at 3-4). Cornell subsequently initiated this action on May 6, 2016, asserting claims for discrimination based on sex and hostile work environment based on sex under Title VII. (Doc. # 1). Brennan filed her Answer on July 18, 2016. (Doc. # 11). The parties mediated on November 14, 2017, but reached an impasse. (Doc. # 27). Then Brennan filed her Motion for Summary Judgment. (Doc. # 30). Cornell responded in opposition on February 5, 2018. (Doc. # 31). Brennan failed to file a reply.

## II. **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to

defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

### A. <u>Discrimination Based on Sex</u>

In Count I, Cornell claims the Postal Service violated Title VII because he was forced to wear a uniform while similarly situated female employees were not.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish his Title VII claim with either direct or circumstantial evidence of discrimination. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)(citing Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999)). "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption. Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] constitute direct evidence of discrimination." Tippie v. Spacelabs Med., Inc., 180 F. App'x 51, 54 (11th Cir. 2006)(quoting Bass v. Bd. of Cty. Comm'rs, Orange Cty., 256 F.3d 1095, 1105 (11th Cir. 2001)). Cornell relies on circumstantial evidence to establish his claim.

In analyzing allegations of single-motive discrimination supported by circumstantial evidence, the Court follows the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. See Marcelin v. Eckerd Corp. of Fla., No. 8:04-cv-491-T-17MAP, 2006 WL 923745, at *4 (M.D. Fla. Apr. 10, 2006)(citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)). Under the McDonnell Douglas framework, the plaintiff bears the

initial burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. McDonnell Douglas, 411 U.S. at 802-03. Once the plaintiff has established a prima facie case, the burden shifts to the defendant. Id.; Dickinson v. Springhill Hosps., Inc., 187 F. App'x 937, 939 (11th Cir. 2006).

To rebut the presumption of discrimination created by the plaintiff's prima facie case, the defendant must provide "legitimate, nondiscriminatory reason[s]" for the employment action taken against the plaintiff. Burdine, 450 U.S. at 254; Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1331 (11th Cir. 1998). If the defendant produces such evidence, the burden shifts again to the plaintiff. McDonnell Douglas, 411 U.S. at 802-03. The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing [his] prima facie case, sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

Here, the Court is concerned only with the prima facie case stage of the McDonnell Douglas framework. Brennan does

not assert that a legitimate non-discriminatory reason existed for any disparate treatment. Rather, Brennan merely argues that Cornell cannot establish a prima facie case of sex discrimination. (Doc. # 30 at 6-7). To establish a prima facie case of disparate treatment, Cornell must demonstrate that he: "(1) belongs to a protected class; (2) suffered an adverse employment action; (3) was qualified to do [his] job; and (4) was treated less favorably than similarly situated employees outside of the protected class." Martin v. Rumsfeld, 137 F. App'x 324, 325 (11th Cir. 2005); see also Wilson, 376 F.3d at 1087.

Brennan does not challenge two of the elements of Cornell's prima facie case. The parties agree Cornell is a member of a protected class — men — and he was qualified to do his job. (Doc. # 30 at 6). The disagreement involves whether Cornell was subjected to an adverse employment action and whether similarly situated female employees were treated more favorably. (Id. at 6-7). The Court will address these elements separately.

### 1. Adverse Employment Action

"[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or

privileges of employment." <u>Davis v. Town of Lake Park</u>, 245 F.3d 1232, 1239 (11th Cir. 2001). "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." <u>Gupta v. Fla. Bd. of Regents</u>, 212 F.3d 571, 587 (11th Cir. 2000)(citation and internal quotation marks omitted). "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." <u>Davis</u>, 245 F.3d at 1239.

Brennan argues Cornell's "claim that he was required to wear the retail clerk polo shirt does not constitute an adverse employment action" because Cornell has failed to show that wearing the shirt "impacted the terms, conditions or privileges of employment in a real and demonstrable way." (Doc. # 30 at 9).

In response, Cornell invokes case law espousing that maintenance of different uniform requirements for different sexes is discrimination. (Doc. # 31 at 8-9); <u>see</u> <u>Carroll v. Talman Fed. Sav. & Loan Ass'n of Chicago</u>, 604 F.2d 1028, 1032

(7th Cir. 1979)(holding it was discrimination based on sex when "two sets of employees performing the same functions are subjected on the basis of sex to two entirely separate dress codes one including a variety of normal business attire and the other requiring a clearly identifiable uniform" (citation omitted)); O'Donnell v. Burlington Coat Factory Warehouse, Inc., 656 F. Supp. 263, 266 (S.D. Ohio 1987)("[I]t is demeaning for one sex to wear a uniform when members of the other sex holding the same positions are allowed to wear professional business attire. . . . [D]efendants have several non-discriminatory alternatives for achieving the goal of sales clerk identification: both sexes could wear the smock, a distinguishing blazer or identifying badges on their professional attire.").

But, in those cases, the uniform policies facially discriminated between sexes. Here, the rule applied equally to men and women, but was allegedly only enforced against men. Thus, those cases do not stand for the proposition that the institution of a facially gender-neutral uniform rule qualifies as "a *serious and material* change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1239.

Still, Cornell insists that "requiring [him] to wear the uniform on the workroom floor was an adverse employment action" because the unequal application of the uniform rule resulted in a loss of prestige and humiliated him. (Doc. # 31 at 9). According to Cornell, his wearing a uniform shirt on the workroom floor resulted in an unkempt appearance when he worked the retail window. That appearance, combined with his being seen in uniform while female employees were seen in non-uniform shirts, reduced his prestige amongst his co-workers. (Id.). The Eleventh Circuit has recognized that "loss of prestige, either within an organization or with regard to the general public, is an objective factor that a court should consider as part of the reasonable person test." Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1452 n.19 (11th Cir. 1998).

More recently, however, the court has expressed some skepticism about the circumstances under which an employment action causing a loss of prestige qualifies as adverse. The Eleventh Circuit clarified its holding in Doe, emphasizing that "an asserted loss of prestige [cannot] transform employer conduct which does not alter the 'terms, conditions, or privileges' of the plaintiff's employment into a proper basis for suit under Title VII's anti-discrimination clause."

*Davis*, 245 F.3d at 1242 n.4. In the context of a verbal reprimand, the *Davis* court warned: "Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely — without more — establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause." *Id.* at 1242.

Even if a loss of prestige great enough to alter the terms and conditions of employment could result from being seen in a sweaty uniform shirt, Cornell has not presented evidence beyond his own declaration that he actually suffered a loss of prestige. There is no objective evidence Cornell lost prestige amongst his coworkers or supervisors — there is only Cornell's subjective belief that he did so. *See* L'Argent v. United Space All., LLC, No. 6:04-cv-1787-Orl-31, 2006 WL 680806, at *10 (M.D. Fla. Mar. 16, 2006)("L'Argent has offered no testimony from other witnesses to support her assertion that her transfer to HMF was a transfer to a less prestigious facility, and thus relies solely on her own assertion, which is insufficient."). This is insufficient to show that Cornell lost prestige because of his wearing the uniform at all times. *See Davis*, 245 F.3d at 1244 ("[E]ven accepting that Davis may have felt some blow to his professional image when he was

removed as OIC, that is simply not enough to prevail on this record."). Therefore, Cornell's perceived loss of prestige does not qualify as an adverse employment action.

Furthermore, the Court notes that Cornell's response mentions his NOS-7 and Shirer's warning that Cornell would receive a larger suspension if he violated the more stringent uniform rule. (Doc. # 31 at 9). Cornell does not identify either act explicitly as discipline constituting an adverse employment action. To the extent Cornell may be relying on the unequal application of discipline to support his claim, Cornell cannot establish an adverse employment action in the form of actual discipline taken against him.

The only formal discipline Cornell actually received was the issuance of the NOS-7 on March 14, 2012. Again, Cornell does not explicitly claim in his response that issuance of the NOS-7 was an adverse employment action undergirding his claim. And Cornell's Complaint never mentions the issuance of the NOS-7 at all. (Doc. # 1). Rather, the Complaint alleges that, from March of 2012 to May of 2014, Cornell's supervisors "required Cornell to wear a uniform at all times and threatened Cornell with discipline if he did not," so "Cornell complied with the rules regarding the uniform." (Id. at ¶ 6). Thus, the Complaint theorizes only that the wearing of the

uniform shirt itself was an adverse employment action and, perhaps, that the threat of discipline for noncompliance was also an adverse employment action.

As it did not form the basis of his claim as framed in the Complaint, Cornell cannot now rely on the issuance of the NOS-7 as the basis for his discrimination claim. See GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012)("After arguing before the District Court on numerous occasions that they did not have to allege a constitutionally impermissible burden on a sincerely held religious belief, Plaintiffs chose to include additional facts with their motion for summary judgment. These additional facts do not appear in the Amended Complaint. It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). Regardless, the NOS-7 would not qualify as an adverse employment action because it was revoked in exchange for Cornell's withdrawing his EEO complaint based on the suspension. See Harris v. Atlanta Indep. Sch. Sys., No. 1:07-CV-2086-RWS/AJB, 2009 WL 10665027, at *25 (N.D. Ga. Aug. 9, 2009)("Ordinarily, a suspension without pay would constitute an adverse employment action. . . . [But] where an employment action is rescinded or fails to take effect before

an employee suffers a harm, the action is not an adverse employment action." (citations omitted)).

After the NOS-7 was issued, Cornell acknowledges he did not violate the uniform rule and was not disciplined. Shirer had warned Cornell on the day the more stringent uniform rule was announced that violation of the rule would result in further discipline. Importantly, the threat of discipline that is never implemented is not an adverse employment action. See Medearis v. CVS Pharmacy, 92 F. Supp. 3d 1294, 1312 (N.D. Ga. 2015)("[N]umerous courts have concluded that '[v]erbal reprimands and threats of termination do not constitute adverse employment actions.'" (quoting Mistretta v. Volusia County Dep't of Corrections, 61 F. Supp. 2d 1255, 1260 (M.D. Fla. 1999)), aff'd sub nom. Medearis v. CVS Pharmacy, Inc., 646 F. App'x 891 (11th Cir. 2016); see also Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182 (6th Cir. 2004)("Mere threats of alleged adverse employment action are generally not sufficient to satisfy the adverse action requirement."). Following Shirer's warning, Cornell complied with the rule that he wear the uniform shirt while on the clock and was never punished for violating the rule. (Cornell Dep. I Doc. # 30-1 at 168:9-169:12). So, Cornell suffered no discipline that could qualify as an adverse employment action.

Cornell has not shown an adverse employment action and has not established a prima facie case of sex discrimination claim under the McDonnell Douglas framework. Summary judgment is granted on Count I.

## 2. Treatment of Similarly Situated Employees

Although the lack of an adverse employment action precludes Cornell's claim, the Court will also analyze Brennan's argument that Cornell has also failed to establish the existence of similarly situated employees. Brennan contends that the four identified female employees were not similarly situated to Cornell. (Doc. # 30 at 9). To determine whether employees are similarly situated to the plaintiff, a court must evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008)(quoting Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 (11th Cir. 2006)). "In doing so, 'the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" McCann, 526 F.3d at 1373 (quoting Burke-Fowler, 447 F.3d at 1323).

In Brennan's eyes, the four female employees named in the Complaint were not similarly situated to Cornell because they were "not involved or accused of the same misconduct" as Cornell and "were [not] issued a notice of suspension for unsatisfactory performance and failure to obey an order of a supervisor." (Doc. # 30 at 11). Cornell disputes this characterization. According to Cornell, Brennan "is essentially arguing that Cornell and [] Tran were not similarly situated because he was discriminatorily punished when she was not punished" and that Brennan's "argument actually shows the discrimination here." (Doc. # 31 at 10). Cornell stresses that after every employee was ordered to wear the uniform shirt at all time in May of 2012, the female employees failed to comply while Cornell complied. (Id.).

The Court agrees with Brennan that the female employees were not similarly situated to Cornell. Again, issuance of the NOS-7 is not the adverse employment action underlying this claim. Even if it were, the misconduct for which Cornell was issued the NOS-7 differed from the conduct engaged in by the female employees. In February of 2012, Cornell had been issued a direct order to purchase a uniform using Postal Service funds by a specific date because his supervisor, Hockenberry, considered Cornell eligible for a uniform

allowance. That date came and went with Cornell refusing to order the uniform shirt. Thus, the NOS-7 and accompanying letter indicate that Cornell was being disciplined for "unsatisfactory performance/failure to follow instructions." (Cornell Dep. I Doc. # 30-1 at 151:11-15). Indeed, Cornell's refusal to obey Hockenberry's instruction was overt. Rather than order the uniform, Cornell argued with his supervisors about the proper interpretation of Postal Service regulations and implied that his supervisors were setting a trap to justify firing him. (Id. at 144:1-13, 148:8-18, 160:22-161:1; Cornell Dep. II Doc. # 30-2 at 57:21-58:3).

In contrast, no one issued a specific order to purchase and wear a uniform shirt by a specific date to Tran or the other female employees. There is no evidence the female employees argued with their supervisors about the uniform rule. Rather, Tran sometimes failed to wear the uniform shirt she owned when working at the retail window. And, in May of 2012, all employees who were window qualified were informed of the new policy that they needed to wear their uniform shirts when they were on the clock. Yet, female employees often set about their duties on the workroom floor in non-uniform shirts anyway. This conduct is not "nearly identical" to that which led to Cornell's NOS-7. Even taking the facts

in the light most favorable to Cornell, openly disobeying a supervisor's order to obtain a uniform by a specific date differs from sometimes wearing a non-uniform shirt without otherwise calling attention to yourself. One is an overt challenge, the other a covert defiance.

Beyond Cornell's refusal to buy and wear the uniform shirt that precipitated the NOS-7, there is no other similar misconduct by Cornell and the female employees. After Shirer warned that the next disciplinary step would be a fourteen-day suspension if Cornell still refused to wear a uniform, Cornell complied with the uniform rule. (Cornell Dep. I Doc. # 30-1 at 168:16-169:12, 172:14-175:25). Cornell claims he committed no misconduct after Shirer's threat because he feared the uniform rule would be strictly enforced against him. Essentially, Cornell complains of the lack of discipline the female employees received for their misconduct, but he received no discipline himself. Again, his conduct is different from the female employees': Cornell became a begrudging rule-follower, the female employees remained furtive rule-breakers.

Furthermore, there is evidence that Tran — the co-worker inspiring most of Cornell's ire — was disciplined at least once for failure to wear her uniform. Shirer testified that,

at his direction, Hockenberry issued Tran a Letter of Warning. (Shirer Dep. Doc. # 31-1 at 19:11-20:19). Although the Court must take all the facts in the light most favorable to Cornell, the Court need not credit Cornell's assertion based "on information and belief" that Tran was never disciplined. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005)("[S]tatements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment."). The record suggests that Tran was disciplined for violating the uniform rule, while Cornell did not need to be disciplined because he followed the uniform rule.

Here, the identified female employees were neither similarly situated to nor more favorably treated than Cornell. Therefore, Cornell has not established a prima facie case of sex discrimination. While the lax enforcement of the uniform policy understandably frustrated Cornell, the Court is mindful that it does not "sit as a super-personnel department that reexamines an entity's business decisions." Davis, 245 F.3d at 1244 (citation omitted). Summary judgment is granted for Brennan on Count I.

## B. __Hostile Work Environment__

In Count II, Cornell alleges that his supervisors' conduct created a hostile work environment based on sex. "To establish a claim of a hostile work environment, an employee must prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1248 (11th Cir. 2014)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Establishing a prima facie case of hostile work environment requires a plaintiff to show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [sex]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

Regarding the first element, both parties agree that Cornell was a member of a protected group — men. Brennan raises no arguments for the second, third, or fifth elements.

But Brennan disputes the fourth element, writing that Cornell "has not demonstrated that the complained-of conduct unreasonably interfered with his job performance." (Doc. # 30 at 13).

The fourth element requires a plaintiff to show the work environment is both subjectively and objectively hostile. Adams, 754 F.3d at 1249. "The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)(citation and internal quotation marks omitted). The Supreme Court has stressed that the objective component is "crucial" to "ensure that courts and juries do not mistake ordinary socializing in the workplace — such as male-on-male horseplay or intersexual flirtation — for discriminatory 'conditions of employment.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

"In assessing the objective component, four factors should be considered: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably

interferes with the employee's job performance." <u>Body v. McDonald</u>, No. 8:13-cv-1215-T-33TGW, 2014 WL 7224814, at *8 (M.D. Fla. Dec. 17, 2014), <u>aff'd sub nom.</u> <u>Body v. Sec'y, Dep't of Veterans Affairs</u>, 616 F. App'x 418 (11th Cir. 2015). Even if the plaintiff can prove one factor, this "does not compensate for the absence of the other factors." <u>Mendoza</u>, 195 F.3d at 1248.

While wearing the uniform shirt on the workroom floor made Cornell's job less pleasant, there is no evidence that Cornell's supervisors' and his female co-workers' behavior *unreasonably* interfered with Cornell's job performance. Although harassment need not be so extreme it produces tangible effects on job performance to be actionable, it is notable that there is no evidence that Cornell's actual performance of his job duties suffered. <u>See</u> <u>Manganiello v. Town of Jupiter Inlet Colony</u>, No. 12-80722-CIV, 2013 WL 6577377, at *10 (S.D. Fla. Dec. 16, 2013)("Plaintiff, however, presents no argument or evidence to support this allegation that Pierson's conduct unreasonably interfered with her job performance. To the contrary, Plaintiff stated during her deposition that she believed she had been doing well at work, received multiple pay raises, and had not had any work performance issues prior to her salary reduction in

2011."). Although Cornell felt irritated or stressed at work because of the uniform rule (Doc. # 31 at 18-19), Cornell has not presented evidence that female employees' wearing non-uniform shirts and supervisors' failure to discipline them unreasonably interfered with his performance of his job. See Mendoza, 195 F.3d at 1249 ("[N]othing in the record indicates that Page's conduct impaired Mendoza's job performance.").

Cornell subjectively found the alleged harassment severe. But, taking the facts in the light most favorable to Cornell, the alleged harassment was not objectively severe and pervasive. The conduct — female employees' wearing non-uniform shirts on the workroom floor with impunity while Cornell wore his uniform shirt — was not physically threatening or humiliating. See Colon v. Envtl. Techs., Inc., 184 F. Supp. 2d 1210, 1220-21 (M.D. Fla. 2001)(granting summary judgment on hostile work environment based on sex claim and finding that no "reasonable person would have believed that [the harassing co-worker's] conduct created any threat of physical harm or intimidation" because although the co-worker made offensive remarks about women and engaged in "crotch-grabbing" directed at Plaintiff, the co-worker "had not touched Plaintiff or any other female employees"); see also Hall v. Gus Const. Co., 842 F.2d 1010, 1012 (8th Cir.

1988)(hostile work environment based on sex established with evidence that, among other things, female employees were held down so other employees could touch their breasts and legs).

Cornell declared he found the uneven application of the uniform rule humiliating. (Doc. # 31 at 5). But there is nothing in the record to support that a reasonable person would feel humiliated because he wore an assigned uniform shirt all day while some female co-workers frequently wore the uniform shirt for only a few hours per day in violation of the employer's rules. Besides Shirer's warning to Cornell to follow the uniform rule or face progressive discipline, Cornell was not even verbally threatened with formal discipline — let alone physical harm — if he did not wear the uniform shirt. And there was evidence from Cornell's own logs that two male employees sometimes failed to wear the uniform shirt. (Cornell Dep. I Doc. # 30-1 at 188:8-190:15, 207:24-208:8, 210:8-13, 212:14-213:4). These men were not subjected to harassment or even formal discipline when they broke the uniform rule. At worst, one male employee, Fugate, was told by a supervisor to put his uniform shirt on. (Id. at 210:14-211:25). Fugate complied and no discipline was issued. The conduct involving the uniform rule was neither humiliating nor threatening.

The conduct, which involved no offensive comments about men, sexual jokes, or touching, occurred over approximately sixteen months and was far less severe than that found insufficient in other hostile work environment cases. See Mendoza, 195 F.3d at 1249 ("[N]one of the conduct alleged by Mendoza is severe. Even if somehow offensive, Page's statement 'I'm getting fired up,' the three sniffing sounds, the one instance of physical conduct, and the following/staring are much less severe than the incidents of sexual banter and inappropriate touching described, and found insufficient [in other cases]."); see also Scott v. Pizza Hut of Am., Inc., 92 F. Supp. 2d 1320, 1326 (M.D. Fla. 2000)("[T]he complained-of acts are insufficiently severe to amount to a Title VII violation. Scott complains of rude language, comments to her that '[i]f she'd go out and get some sex, she wouldn't be so bitchy,' seeing the tracing of an obscene gesture in an air-conditioner's condensation, another employee being picked up and touched, foul lyrics being played in a song and threatening stares from other employees. All of these incidents, while boorish, stupid, and inconsiderate, do not rise to the level of the complained-of treatment in Mendoza, Sullivan, Hall or Hopkins.").

Cornell also attempts to base his claim on two of his supervisors' supposed flirtatious treatment of female employees. (Doc. # 31 at 17-18). He notes that Hockenberry and Moseley showed "frequent favoritism and inordinate attention" toward attractive female employees. (Id. at 17). But the only example Cornell provides of such "favoritism" is actually an example of inappropriate treatment of a female employee. Cornell writes that he "was also aware that Moseley had put the 'moves' on one of the attractive females" in the office. (Id. at 14, 17). This "attractive female" employee was "clearly upset" and told Cornell's wife, another Post Office employee, about Moseley's unwelcome advances. (Id.; Cornell Dep. I Doc. # 30-1 at 234:17-235:20). When Cornell's wife confronted Moseley about it, Moseley told Cornell's wife "to mind her own business." (Cornell Dep. I Doc. # 30-1 at 234:17-235:20; Doc. # 31 at 14, 17).

There are multiple problems with Cornell's insistence that a male supervisor's unwelcome sexual advances toward a female employee — and then his upbraiding another female employee who opposed such conduct — is evidence that male employees were being harassed based on their sex. First, no such allegations are included in the Complaint. See GeorgiaCarry.Org, 687 F.3d at 1258 n.27 ("It is well-settled

in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."). Therefore, the theory of "favoritism" shown to attractive female employees should not be considered.

Next, even if the theory of "favoritism" could be considered, this conduct does not establish the existence of a hostile work environment for male employees. Cornell is partially correct that "incidents of harassment directed at employees other than the plaintiff can be used as proof of the plaintiff's claim of a hostile work environment." (Doc. # 31 at 17). But, for those cases, the claim is based on the harassment experienced by other members of the plaintiff's protected class. See Walker v. Ford Motor Co., 684 F.2d 1355, 1359 (11th Cir. 1982)("The fact that many of the [racial] epithets [about African-Americans] were not directed at [the African-American plaintiff] is not determinative. The offensive language often was used in Walker's presence after he had voiced objections to Ford. Accordingly, we find that under the circumstances Northgate's conduct 'creat[ed] a working environment heavily charged with ethnic or racial discrimination.'"); see also Sousa v. Bay Shore Dev. Corp., Case No. 93-8107-CIV-RYSKAMP, 1994 U.S. Dist. LEXIS 10984 at *12 (S.D. Fla. June 24, 1994)("The Eleventh Circuit and many

other federal courts have consistently allowed plaintiffs to sue under Title VII for harassment not directed at the plaintiff, but directed at members of the plaintiff's protected class in the plaintiff's presence."). Cornell is male, but mentions only supervisors' flirting and making the "moves" on female employees. The record does not support that the supervisors' flirtatiousness — or worse — towards female employees created an objectively hostile work environment for male employees.

Because Cornell has not established a prima facie case of hostile work environment based on his sex, the Court grants Brennan's Motion for Count II.

**IV.  Conclusion**

Because Cornell failed to establish a prima facie case for his sex discrimination and hostile work environment claims, Brennan's Motion for Summary Judgment is granted on both counts.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant Megan J. Brennan's Motion for Summary Judgment (Doc. # 30) is **GRANTED**.

(2)    The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff Richard Cornell on both counts of the Complaint.

(3)    Thereafter, the Clerk is directed to **CLOSE THE CASE**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 2nd day of May, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE